J-A23017-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | | |
|---|---|---|---|
| R.E. AND L.E. | : | IN THE SUPERIOR COURT OF | |
| | : | PENNSYLVANIA | |
| Appellants | : | | |
| | : | | |
| | : | | |
| v. | : | | |
| | : | | |
| | : | | |
| S.B. AND J.W. | : | No. 667 MDA 2022 | |

Appeal from the Order Entered March 30, 2022
In the Court of Common Pleas of Dauphin County Civil Division
at No(s):  2013-CV-04024-CU

BEFORE:     BOWES, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McCAFFERY, J.:          **FILED: OCTOBER 11, 2022**

In this custody matter, R.E. and L.E. (collectively, Great-grandparents) are the paternal great-grandparents, and had sole legal custody and primary physical custody, of the subject child, A.W. (Child), born in July of 2012. Great-grandparents now appeal from the order entered in the Dauphin County Court of Common Pleas, which granted the *pro se* petition of S.B. (Mother) for primary physical custody and shared legal custody.[1]  Great-grandparents aver the trial court erred in: (1) awarding Mother primary physical custody because

_____

[*] Former Justice specially assigned to the Superior Court.

[1] It appears Mother and Child's father, J.W. (Father) were never married.  Both appeared *pro se* at the March 15, 2022, custody hearing, and neither has filed a brief with this Court.

the Section 5328(a)[2] custody factors weighed heavily in their favor; (2) failing to consider Mother's violations of the prior custody order; and (3) excluding testimony from Child's counselor about his observations during Child's play therapy sessions. We affirm.

## I. Earlier Facts & Procedural History

Mother and Father are the parents of Child. At the time of the underlying March 15, 2022, custody hearing: Child was nine years old; Mother was 29; Father was 37; L.E. (Great-grandmother) was 73; and R.E. (Great-grandfather) was 77 years old. N.T. Custody H'rg, 3/15/22, at 9, 27, 87, 169. We review the extended factual history of this case.

Upon Child's birth, she, Mother, and Father initially lived together in Altoona, Blair County. Three months later, in October of 2012, they moved into the home of Father's grandparents — Great-grandparents — in Elizabethtown, Dauphin County. Trial Ct. Mem. Op., 3/30/22 (Mem. Op.), at 1. Sometime in 2013, Mother indicated she intended to move back to Altoona with Child. *See* N.T., 3/15/22, at 15. In response, in May of 2013, "Great-Grandparents initiated a custody action due to concern that Mother could not adequately care for [C]hild due to an alleged drug addiction.[ ]" *See* Memo. Op. at 1 (footnote omitted).

In a prior appeal, this Court summarized the ensuing procedural history:

---

[2] *See* 23 Pa.C.S. § 5328(a).

In July 2013, the trial court granted the parties shared legal custody, [with] primary physical custody to Great-Grandparents and Father, who still resided with Great-Grandparents. Great-Grandparents were to supervise Father's custody time. Mother, who had moved to Blair County, had partial custody every weekend.

The custody terms were modified a few times, with minor changes. . . . In January 2017, following a custody hearing, the court entered a final custody order that provided that the parties had shared legal custody. Great-Grandparents had primary physical custody, and Mother and Father had partial physical custody every other weekend during the school year and a two-week vacation period for each parent in the summer.

Mother was directed to comply with a number of provisions including that she . . . use Our Family Wizard, an information-sharing website for separated parties. Mother also had to maintain drug rehabilitation, attend group and individual counseling, undergo periodic drug tests and provide quarterly updates about test results to Father and Great-Grandparents, obtain counseling for anger, and enroll in a 12-week parenting program. The order had similar requirements for Father.

*R. & L.E. v. S.B.*, 1693 MDA 2019 (unpub. memo. at 2-3) (Pa. Super. May 7, 2020).

At some point, Mother's mother (Maternal Grandmother) made accusations that Great-grandfather, as well as Father's brother, Father's father, and another paternal relative all sexually assaulted Child. *R. & L.E.*, 1693 MDA 2019 at 6, 11-12. These claims were investigated by authorities and eventually determined to be unfounded.[3] *Id.* Nevertheless, due to this

_____

[3] Father's brother was in fact in prison at the time of the alleged assault, and the fourth relative was living in Tennessee. *R. & L.E.*, 1693 MDA 2019 at 11-12.

- 3 -

allegation against Great-grandfather, Mother initially refused to return Child to Great-grandparents following a visit in August of 2019.

The prior Superior Court panel summarized:

On August 21, 2019, Great-Grandparents filed an emergency petition for special relief asserting . . . Mother had failed to return Child [to them].  Great-Grandparents also filed a petition for contempt asserting Mother violated the prior court order by failing to return Child and in failing to comply with terms of the January 2017 order, including failing to use Our Family Wizard, undergo drug tests and provide quarterly updates, enroll in counseling for anger, and enroll in a 12-week parenting program.

The trial court granted Great-Grandparents' petition for emergency relief, directing Mother to return Child.  It scheduled a hearing on the petition for contempt.

On August 26, 2019, Great-Grandparents filed a second emergency petition for special relief[, arguing] Mother had failed to transfer custody as directed in the prior order.  The court granted the petition and again directed Mother to return Child to Great-Grandparents.  The court also suspended Mother's custody rights.

In September 2019, Mother filed[, *inter alia*,] a petition for modification of custody, seeking primary physical custody. . . .

*R. & L.E.*, 1693 MDA 2019 at 3.

## II.  September 27 Custody Hearing & October 2, 2019, Order

On September 27, 2019, the Honorable Jeannine Turgeon conducted a hearing on Great-grandparents' petition for contempt as well as Mother's petition for modification of custody.  The court heard testimony from Great-

- 4 -

grandparents, Mother, Father, and Maternal Grandmother.[4]  At this time, Mother also had a one-year old daughter (Sister), with whom she lived in a two-bedroom apartment in Altoona.[5]  N.T., 9/27/19, at 22.  Mother testified she had been drug-free for almost seven years and was working at a call center.  *Id.* at 21.  Father was a truck driver and lived with his girlfriend in an apartment in Altoona; his girlfriend has children, with whom Child got along well.  *Id.* at 28-29.  Father stated "pretty much all of" his family, with whom he was close, also lived in Altoona.  *Id.* at 29-30.

Dr. Jaeme Schwartz-Bogrette, who owned the counseling center Child had attended since 2017, testified to the following:

> [Child was diagnosed] with oppositional defiant disorder, generalized anxiety disorder, and post-traumatic stress disorder. [T]he PTSD stemmed from "the trauma from being removed from . . . a parental unit."  N.T., 9/27/19, at 61[.]
>
> . . . Child behaves differently immediately after she spends time with Mother and Father[.]  Specifically, . . . after having contact with Mother and Father, Child displays an increase in self-negativity, swearing, and aggression.  [T]his type of behavior is often [a] mark[ ] of a child experiencing trauma and raises concerns about future self-harm.  [Dr. Schwartz-Bogrette] believes that changes in the dynamics of Child's visitations with Mother and Father are necessary to avoid continuation of this behavior.

---

[4] Mother was represented by counsel at this hearing.  Additional witnesses called to testify were: Mother's brother, M.B.; Father's mother, J.W. (Great-grandmother's daughter); and Child's kindergarten teacher.

[5] Sister's father passed away before Sister as born.  N.T., 3/15/22, at 14.

*R. & L.E.*, 1693 MDA 2019 at 6-7 (record citation omitted).

On October 2, 2019, the trial court issued a custody order, which primarily maintained the status quo: Great-Grandparents were granted primary physical custody, Mother and Father partial physical custody every other weekend, and Mother and Father each two weeks' custody in the summer. The court also granted Great-Grandparents sole legal custody, whereas previously they shared it with Mother and Father.

The trial court considered the rebuttable statutory presumption, at Section 5327(b) of the Custody Act,[6] which favors custody with a parent over a third party.[7] Nevertheless, the court found a "plethora of clear and convincing evidence to rebut the presumption," and concluded it was in Child's best interest to remain in Great-grandparents' primary physical custody. *R. & L.E.*, 1693 MDA 2019 at 18 (record citation omitted). In support, the court examined each of the 17 statutory factors at Section 5328;[8] this review was discussed in detail in this Court's prior memorandum. *Id.* at 18-21. The court also found Maternal Grandmother — who had made the allegations of sexual

_____

[6] 23 Pa.C.S. §§ 5321-5340.

[7] **See** 23 Pa.C.S. § 5327(b) ("In any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence.")

[8] Section 5328 includes a subsection (2.1), in addition to subsections (1) through (16).

assault — showed "assaultive" and "aggressive behavior" herself, and the court forbade unsupervised visits between her and Child. *Id.* at 19 (record citation omitted). Mother appealed from the October 2019 custody order, and this Court affirmed on May 7, 2020.

### III. March 15 Custody Hearing & March 30, 2022, Order

On November 12, 2021, Mother filed the underlying *pro se* petition for modification of custody, averring she had no drug or other issues and she was fit to have custody of Child. On March 15, 2022, the Honorable Andrew Dowling conducted a custody hearing. The trial court interviewed Child *in camera*; she was nine years old and in fourth grade. Father, Great-grandparents, and Mother's stepfather D.R. testified.[9]

Mother appeared *pro se* and testified to the following:

[S]he rents a five-bedroom house in Altoona where she lives with her four-year old daughter, who is [Child's half-sister]. When the Child visits on the weekends, she sleeps in the attic, which is finished with two bedrooms. . . . Child is very happy in Altoona and has numerous relatives that she likes to see and spend time with. Furthermore, . . . Child wants to be babied and taken care of by [M]other with respect to bathing, brushing teeth, and being put to sleep at night. Mother believes that this is because the Child does not receive this type of care with Great-Grandparents.

Both Mother and Father live in Altoona along with Mother's stepfather, [D.R.,] Mother's brother and nephew, and Father's parents, siblings, and cousins. Mother is not currently working. Her last job was a temporary job in December of 2021.

---

[9] Great-grandparents' two children, G.E. and T.K., also testified briefly.

Mother stated that the current custody schedule does not allow her sufficient time to spend with Child and for the Child to spend time with her extended family in Altoona. Mother asserts that the Child is very happy being with her . . . and [S]ister. They play video games together, go shopping, and just hang out together. The Child also has several friends in Altoona.

Mother . . . thinks that it is important for the Child to maintain a relationship with Great-Grandparents. Although Mother wants primary physical custody[, s]he suggested that Great-Grandparents get physical custody . . . every other weekend . . . .

Mem. Op. at 3-4. Furthermore, "Mother credibly testified that she had drug issues in the past but has been clean for . . . the last eight years." *Id*. at 12. Mother now "has very little contact with [Maternal Grandmother] and would only allow the Child to be around her if [Maternal Grandmother were] in a proper frame of mind and did not pose a risk of harm to the Child." *Id.* at 8.

The trial court summarized Great-grandparents' testimony as follows:

[Child] lives with Great-grandparents in a four-bedroom house where she has two bedrooms for herself. The Child has lived in this house since she was three months old. There was testimony that the Child enjoys a close relationship with both of her Great-Grandparents, and has many friends in Elizabethtown.

Both Great-Grand[parents] are retired. They have enrolled the Child into several extra-curricular activities, including cello, karate, and tutoring [for] math and reading comprehension. Great-Grandmother testified that she encourages the Child to have a relationship with Mother and Father and gives her extra time with them on occasion.

Mem. Op. at 4-5.

Additionally, Great-grandparents presented the testimony of Child's counselor, Brent Johnson, who had a total 18 sessions with Child. Mr. Johnson

- 8 -

initially diagnosed the Child with generalized anxiety disorder, but later changed that diagnosis to unspecified anxiety disorder. He testified that the Child [had] angry outbursts, speculatively as a result of her upbringing and how her primary caretakers were modeling behavior and speaking with her.

However, after counseling, [Child] has been having less angry outbursts and has been communicating her thoughts and emotions in a better way. As a result, he was going to discharge the Child from counseling at the end of March of [2022].

Mem. Op. at 5 (paragraph break added).

On March 30, 2022, the trial court issued the underlying order, granting Mother's petition. The order provided that beginning in June of 2022, following the end of Child's school year, Mother would have primary physical custody and Great-grandparents partial custody every other weekend. Furthermore, Mother and Great-grandparents would share legal custody.

In support, the trial court reviewed the Section 5328 custody factors anew and found the following: 10 factors did not weigh in favor of either party. Two factors weighed in Mother's favor — the availability of extended family and the Child's sibling relationships. The court reasoned that although the parties were "equally able to maintain a loving[ and] stable" relationship with Child, it could not "ignore the innate connection between a mother and daughter that is more adequate for the Child's emotional needs[.]" Mem. Op. at 10-11.

Pertinently, the trial court also had "concerns about the physical condition of Great-grandparents to effectively parent the Child as she grows[.]" Mem. Op. at 13. The court considered their ages — 73 and 77 —

and that both wore hearing aids and had trouble hearing at the custody proceeding. *See id.* The court further noted Great-grandparents turned off their hearing aids at night when they sleep. Meanwhile, Mother appeared to be in good health with no current mental or physical issues.

The trial court found two factors weighed in Great-grandparents' favor — first, the parental duties they have performed on behalf of Child. However, this was the result of their role as the primary caregivers for a lengthy period and the fact the parties lived three hours apart, as it would be unreasonable for Mother to drive six hours round-trip to attend a one-hour parent/teacher conference or medical appointment. Mem. Op. at 9. Furthermore, Mother performed parental duties during her periods of custody, including, bathing and dressing Child and taking her to the doctor if necessary. *Id.* at 8. Second, the need for stability and continuity in Child's education, family life and community life weighed "moderately" in Great-grandparents' favor. *Id.* at 9. The court reasoned it was in Child's best interest to stay in her current school district through the end of the school year, and the modification to custody would not start until thereafter. *Id.*

The trial court acknowledged the changes in circumstances over time and the appropriateness to focus on Child's present needs:

> We heard testimony from various witnesses about incidents that happened when [Child] was a baby. Since all of that occurred prior to the most recent custody Order, it is not necessarily relevant to our current decision. Rather, the question being presented to the Court is simply this: What is in the best interest

of the Child at this moment in time?

Mem. Op. at 5. The court concluded that presently,

> Mother was very organized, well-spoken and authentic in her desire to obtain primary custody of her daughter. Although Mother has had problems in the past, we do not believe that those problems persist today. There was no evidence that Mother has abused any drugs or alcohol within the past several years. Additionally, [M]aternal [G]randmother has been an issue in the past, but Mother recognizes this fact and will not allow the Child to be around her maternal grandmother unsupervised, and even those visits will only occur when [M]aternal [G]randmother is in a good headspace.
>
> Moreover, Mother's past issues should not forever preclude her from having primary custody of her daughter. As noted in the above factors, they do not significantly favor Great-Grandparents at this point in time. Thus, Great-Grandparents have not rebutted the presumption that Mother is a fit parent with clear and convincing evidence.

*Id.* at 13.

Great-grandparents filed a timely notice of appeal, along with a Pa.R.A.P. 1925(a)(2)(i) concise statement of errors complained of on appeal. As stated above, neither Mother nor Father have filed a brief with this Court.

### IV. Statement of Questions Involved

On appeal, Great-grandparents present three issues for review:[10]

---

[10] Great-grandparents present all three of their issues together under one heading, and intermingles arguments for the first two issues. We remind Great-grandparents' counsel: "The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part — in distinctive type or in type distinctively displayed — the particular point treated therein[.]" *See* Pa.R.A.P. 2119(a).

1. Did the trial court err and abuse its discretion by awarding [Mother] primary physical custody of [C]hild when the custody factors weighed heavily in favor of [Great-grandparents], who have had primary physical custody of the [C]hild since 2013?

2. Did the trial court err and abuse its discretion by failing to consider [Mother's] numerous violations of the October 2, 2019 Order of Court-Parenting Plan including, but not limited to, paragraphs 93 through 95, which specifically addresses modifications to or disputes about the parenting plan?

3. Did the trial court err and abuse its discretion by excluding certain testimony from the [C]hild's counselor specifically his observations during the [C]hild's play therapy sessions?

Great-grandparents' Brief at 3.

## V. Standard of Review, Section 5328(a) & Statutory Presumption

Preliminarily, we note the relevant standard of review:

This Court reviews a custody determination for an abuse of discretion. We will not find an abuse of discretion "merely because a reviewing court would have reached a different conclusion." Rather, "[a]ppellate courts will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will."

Further, when this Court reviews a trial court's "best interests" analysis in custody matters, our scope of review is broad, but we are "bound by findings supported in the record, and may reject conclusions drawn by the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court." Importantly, "[o]n issues of credibility and weight of the evidence, we defer to the findings of the trial judge who has had the opportunity to observe the proceedings and demeanor of the witnesses." We can only interfere where the "custody order is manifestly unreasonable as shown by the evidence of record."

***R.L. v. M.A.***, 209 A.3d 391, 395 (Pa. Super. 2019) (citations omitted). This

Court has stated:

> It is not this Court's function to determine whether the trial court reached the "right" decision; rather, we must consider whether, "based on the evidence presented, given due deference to the trial court's weight and credibility determinations," the trial court erred or abused its discretion in awarding custody to the prevailing party.

***King v. King***, 889 A.2d 630, 632 (Pa. Super. 2005) (citation omitted).

The Custody Act requires a trial court to consider all of the Section

5328(a) factors when reviewing a custody petition. ***See*** 23 Pa.C.S. § 5328(a).

> A trial court must "delineate the reasons for its decision when making an award of custody either on the record or in a written opinion." [***See***] 23 Pa.C.S. § 5323(a)[,] (d). However, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations."
>
> "The paramount concern in child custody cases is the best interests of the child." "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being."

***R.L.***, 209 A.3d at 395 (some citations omitted).

> Section 5328(a) states:
>
> **(a) *Factors.*—**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
>> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by

another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a)(1)-(16).

We further note the following authority governing a custody matter between a parent and third party. Section 5327 provides: "In any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence." 23 Pa.C.S. § 5327(b).

This Court has explained:

The parent has a *prima facie* right to custody, "which will be forfeited only if convincing reasons appear that the child's best interest will be served by an award to the third party." . . . The presumption in favor of the parent may be rebutted by clear and convincing evidence." 23 Pa.C.S. § 5327(b). This Court has defined clear and convincing evidence "as presenting evidence that is so clear, direct, weighty, and convincing so as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue."

Accordingly, "even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the biological parents' side." When making a decision to award primary physical custody to a nonparent, the trial court must "hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side."

- 15 -

These principles do not preclude an award of custody to the nonparent but simply instruct the trial court that the nonparent bears the burden of production and the burden of persuasion and that the nonparent's burden is heavy. It is well settled, "[w]hile this Commonwealth places great importance on biological ties, it does not do so to the extent that the biological parent's right to custody will trump the best interests of the child. In all custody matters, our primary concern is, and must continue to be, the well-being of the most fragile human participant — that of the minor child." "Once it is established that someone who is not the biological parent is in *loco parentis*, that person does not need to establish that the biological parent is unfit, but instead must establish by clear and convincing evidence that it is in the best interests of the children to maintain that relationship or be with that person."

***R.L.***, 209 A.3d at 396 (emphasis & some citations omitted).

## VI. Great-grandparents' Arguments: Custody Factors

We address Great-grandparents' first two issues together. First, they aver they have shown by clear and convincing evidence that primary physical custody with them is in Child's best interest. Great-grandparents' Brief at 28. They argue the majority of the Section 5328 factors weigh in their favor, and present the following discussion:[11] first, Great-grandparents are more likely to encourage continuing contact between Child and Mother, where: (1) they "have always made the Child available to Mother and Father[;]" (2) Mother

---

[11] Great-grandparents state two statutory factors are neutral: (1) the eighth factor, where neither party presented evidence that the other attempted to turn Child against them; and (2) the eleventh factor, as the parties live approximately three hours from each other. Great-grandparents' Brief at 19, 21.

withheld Child from them in 2019 due to Maternal Grandmother's accusations of sexual assault; and (3) and Mother and Father do not exercise the weekday visits granted them in the October of 2019 custody order. *Id.* at 14. With regard to the second factor, Great-grandparents have never abused Child or anyone else; meanwhile, the reason why they "initially filed for custody in 2013 [was that] Mother and Father took sleeping pills all day and could not care for the Child." *Id.* at 15-16.

With respect to both the third and tenth factor, Great-grandparents assert they: (1) have performed all parental duties for Child; and (2) are more likely to attend to Child's daily physical, emotional, developmental, and educational needs. Great-grandparents' Brief at 16, 20. In support, Great-grandparents aver Mother has not attended Child's medical appointments or parent/teacher conferences, has not had much involvement with Child's school, or even knew the teacher's name. *See id.* at 16, 20. They contest the trial court's reasoning that Mother's failure to attend Child's medical and teacher appointments was excusable due to the long drive. Great-grandparents insist it was Mother's "choice" to move back to Altoona in May of 2013 after residing in Elizabethtown for eight months, and "[a]t any time, Mother could have moved closer to the Child." *Id.* at 24. Great-grandparents also reason Mother could have attended the appointments by phone or video. Great-grandparents maintain this Court is not bound by the trial court's inferences or deductions. *Id.* at 23-24.

Great-grandparents contend the fourth factor — Child's need for stability and continuity in her education, family life, and community life — weighs heavily in their favor because: Child has lived with them since the age of three months, has attended the same school since kindergarten, and received tutoring at Great-grandparents' expense; and Great-grandparents communicate with her teacher and ensure homework is complete, but the homework is not completed when Child is with Mother. Great-grandparents' Brief at 17.

With regard to the fifth factor, the availability of extended family, Great-grandparents maintain that their two children — Child's great uncle and great aunt — testified at the hearing that they regularly see and have a good relationship with Child. Great-grandparents' Brief at 18. Although Mother testified about having extended family in Altoona, she did not "present any testimony, other than from her stepfather . . . of any other family member's relationship with the Child." *Id.* at 17. Meanwhile, Mother has acknowledged Maternal Grandmother is "argumentative and a danger in the past[,]" and furthermore, Maternal Grandmother "has a criminal history of DUI and trying to fill someone else's prescription." *Id.* at 17-18. With respect to the sixth factor — the Child's sibling relationships, which the trial court found weighed "heavily in favor of Mother"[12] — Great-grandparents argue, in sum: "The Child

_____

[12] Mem. Op. at 10.

has a four . . . year old half-sister at Mother's residence. There were concerns raised in prior hearings concerning the Child being left alone to care for her half-sister." *Id.* at 18.

The seventh factor for a trial court to consider is the Child's "well-reasoned preference[,] based on [their] maturity and judgment." 23 Pa.C.S. § 5328(a)(7). Here, Great-grandparents maintain Child told the court that she enjoyed, *inter alia*, her school, playing with her dog, karate, and playing cello. Great-grandparents' Brief at 18. However, Great-grandparents concede the trial court observed "Child was very shy and was not comfortable talking to him." *Id.* at 19.

Great-grandparents further contend the ninth factor — which party is "more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs" — weighs in their favor. *See* Great-grandparents' Brief at 19. In support, they cite the fact that Child has lived with them since she was three months old, she has two bedrooms at their home, "numerous pets, and . . . everything she could ever want or need." *Id.* Great-grandparents also rely on Child's counselor Mr. Johnson's testimony that: (1) Great-grandparents participated in sessions with Child, but Mother and Father have never contacted him; (2) he suspected Child had "an avoidance attachment disorder, meaning that she had a hard time trusting adults and trusting her own emotions and feelings[;]" and (3) he "was told that [Father] would sometimes belittle the Child and any amount

of berating paired with neglect from an adult would explain her symptoms." *Id.* at 19-20.

Next, Great-grandparents contend, pursuant to the twelfth factor, that they are better suited to make child-care arrangements, "as they are retired and available at all times[ ]" and have stable pension and Social Security retirement income. Great-grandparents' Brief at 21-22. Mother, however, they point out, is unemployed and she did not present any testimony about her ability to obtain childcare. *Id.* at 22. Great-grandparents' also cite Mother's present unemployment under the sixteenth, "catchall" factor," which directs a court to consider "[a]ny other relevant factor." *See* 23 Pa.C.S. § 5328(a)(16); Great-grandparents' Brief at 22-23.

With regard to the thirteenth factor, Great-grandparents maintain "[t]here is a high level of conflict between the parties[, and] Mother admitted to disliking Great-grandparents." Great-grandparents' Brief at 22.

Relevant to the fourteenth factor, Great-grandparents reiterate they have no history of drug or alcohol abuse, and to the fifteenth factor (the parties' mental and physical condition), that they are healthy and physically capable of caring for Child. Great-grandparents' Brief at 22. With respect to the trial court's discussion of their limited hearing, Great-grandparents explain "they failed to turn their hearing aids up prior to the hearing and" the court itself acknowledged the "terrible" acoustics in the courtroom. *Id.* at 27. Meanwhile, Great-grandparents cite Mother's use of "opiates, pills and

heroin . . . prior to getting pregnant with Child," and the fact "Child was born addicted to drugs." *Id.* at 22.

In sum, Great-grandparents conclude the trial court "failed to consider the impact [of] moving the Child three . . . hours from the only home she has known [and] ripping her from" her school and friends, and instead the court allowed Mother's right to custody trump" Child's best interests. Great-grandparents' Brief at 25. Great-grandparents challenge the trial court's finding that the "innate connection between a mother and daughter" will benefit Child, where "Mother has only played a minimal role in the Child's life . . . and chosen to be absent for all the important events in the Child's upbringing." *Id.* at 25-26. Great-grandparents argue, "It is naïve of [the trial court] to believe that Mother will suddenly step up and perform parental duties[.]" *Id.* at 24.

In their second issue, Great-grandparents assert the trial court erred in failing to consider that Mother committed numerous violations of the October, 2, 2019, custody order. They assert that Mother "admitted [she was] in contempt of several provisions of the October 2, 2019 Order" — by not providing "quarterly updates . . . concerning her rehabilitation, group and individual, and periodical drug testing[,] enroll[ing] in a [12] week parenting course, although she did allege that she completed a shorter course[,]" nor having her counselor communicate with Child's counselor about "issues

related to the Child[.]" Great-grandparents' Brief at 23. After careful review, we conclude no relief is due.

## VII. Analysis: Custody Factors

We observe that in arguing the Section 5328(a) statutory factors weigh in their favor, Great-grandparents cite past circumstances — including Mother's drug use, Maternal Grandmother's unfounded allegations of sexual assault as well as her own conduct, and Mother's failure to return Child to their care in August of 2019. *See* Great-grandparents' Brief at 14-16. Two years and five months passed between the September of 2019 and March of 2022 custody hearings. Great-grandparents ignore the trial court's discussion that while past evidence informed prior custody orders, they were not as relevant to the instant custody decision. *See* Mem. Op. at 5. Great-grandparents do not refute the court's specific point that "[t]here was no evidence that Mother has abused any drugs or alcohol within the past several years." *See id.* at 13. Great-grandparents likewise ignore the court's discussion that the issues surrounding Maternal Grandmother's behavior were no longer significant, as Mother has recognized those issues, has "very little contact with her," "and will not allow the Child to be around [her] unsupervised[.]" *See id.* at 8, 13. Finally, although Dr. Schwartz-Bogrette testified at the September 2019 hearing that Child acted aggressively following visits with Mother and Father and that "changes in the dynamics of Child's visitations with Mother and Father [were] necessary[,]" Mr. Johnson testified at the March 2022 hearing that

after counselling, Child had less outbursts and was communicating in a better way, and thus he would discharge Child from counseling. *R. & L.E.*, 1693 MDA 2019 at 6-7; Mem. Op. at 5. We conclude the court properly focused its review on what would be in Child's best interests "at this moment in time[.]" *See* Mem. Op. at 5.

We further note Great-grandparents cite the evidence favorable to them, with an implicit request for this Court to reweigh the evidence in their favor, and to supplant the trial court's findings with our own. This we cannot do, as we give due deference to the court's weight and credibility determinations. *See King*, 889 A.2d at 632. Furthermore, "we are 'bound by findings supported in the record, and may reject conclusions drawn by the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.'" *R.L.*, 209 A.3d at 395.

Here, contrary to Great-grandparents' position, the trial court found the majority of the Section 5328(a) factors did not weigh in either party's favor. Pertinently, it found: (1) "there does not seem to be any indication that any party is preventing contact with the Child," *see* 23 Pa.C.S. § 5328(a)(1); (2) there no risk of harm to the Child when in Mother's care, *see* 23 Pa.C.S. § 5328(a)(2); (3) the court did not ask Child where she preferred to live due to her young age, *see* 23 Pa.C.S. § 5328(a)(7); (4) "both parties credibly testified that it was important for the Child to have a good relationship with" the other, *see* 23 Pa.C.S. § 5328(a)(8); (5) although the parties were "equally

able to maintain a loving, stable, consistent and nurturing relationship with the Child," the court could not "ignore the innate connection between a mother and daughter that is more adequate for the Child's emotional needs than her relationship with her Great-Grandparents[,]" *see* 23 Pa.C.S. § 5328(a)(9); (6) the parties were "equally able to attend to [Child's] daily physical, emotional, developmental, educational, and special needs[,]" although again, "there is an innate connection between a mother and daughter that is more likely to nurture the needs of the Child[,]" *see* 23 Pa.C.S. § 5328(a)(10); and (7) any conflict inherent in "the adversarial nature of the custody proceeding" did not appear to affect the parties' ability to cooperate with one another, *see* 23 Pa.C.S. § 5328(a)(13). Mem. Op. at 7-8, 10-12.

We reiterate Great-grandparents' challenge to the trial court's finding, under the third factor, that their performance of parental duties for Child was a natural product of their being the primary caregivers, as well as the long distance the parties lived from one another. *See* Mem. Op. at 8-9. Great-grandparents focus on Mother's decision, almost nine years earlier, to leave Elizabethtown after living with them for nine months, to return to Altoona. Great-grandparents' Brief at 24. In advancing this argument, however, Great-grandparents ignore the court's findings that: both Mother and Father have an extensive, supportive family network in Altoona; Child's younger half-sister lives with Mother; and Father lives in Altoona as well and his girlfriend and her children are also a part of Child's life. *See* Mem. Op. at 9-10.

- 24 -

Furthermore, with regard to Great-grandparents' contention that a sudden and "extreme" change in custody would be disruptive to Child's life, the trial court acknowledged it was in "Child's best interest to stay in her current school district until the end of the school year[,]" and thus the new custody schedule would not take effect for a few months, until June of 2022. *See* Great-grandparents' Brief at 25; Mem. Op. at 9. Great-grandparents also overlook it was Mother's desire that, if granted primary physical custody, Child would maintain a relationship with Great-grandparents and Great-grandparents should have custody every other weekend. *See* Mem. Op. at 4. We conclude the trial court properly considered the effects of a custody modification on Child.

Finally, as discussed above, the trial court specifically considered that the Section 5327(b) statutory presumption "tipped hard" in favor of custody with Mother. *See* Mem. Op. at 6-7. The court found Great-grandparents did not present clear and convincing evidence to rebut that presumption. *See* *R.L.*, 209 A.3d at 396. We conclude the trial court's findings are supported by the record, and the court did not abuse its discretion in granting primary physical custody to Mother, with shared legal custody to Mother and Great-grandparents. We incorporate the above discussion to conclude no relief is due on Great-grandparents' arguments that Mother has violated portions of the prior October 2, 2019, custody order by, *inter alia*, allegedly not providing updates on her counseling or completing a full 12 week-parenting course.

## VIII. Preclusion of Counselor's Testimony

Next, Great-grandparents challenge the trial court's preclusion of testimony, by Child's counselor Mr. Johnson, as to his observations of Child's play therapy sessions.[13]  **See** Great-grandparents' Brief at 27-28.  Their sole argument, after briefly setting forth the relevant context is, in sum: "It is believed that Mr. Johnson's testimony concerning his observations during the Child's play therapy sessions would have help[ed to] shed light on several of the custody factors."  **Id.** at 28.

We conclude this issue is waived for failure to properly develop a cohesive argument.  **See** Pa.R.A.P. 2119(a) (argument shall include "the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent").  Great-grandparents' one-sentence statement offers no explanation what Mr. Johnson's testimony would have been, nor which custody factors they would have related to.  Without any discussion whatsoever, this Court cannot review their bald claim.

Furthermore, Great-grandparents ignore the trial court's discussion that: (1) they did not present Mr. Johnson as an expert witness; (2) they

_____

[13] Great-grandparents called Mr. Johnson as a witness at the March 15, 2022, hearing.  **See** Pa.R.A.P. 1925(a) Op., 5/17/22, at 2-3 (unpaginated).  Great-grandparents' attorney asked Mr. Johnson if he were "able to determine[, through the counselling sessions,] who [Child] feels closest to[.]"  N.T., 3/15/22, at 119.  Mother objected, and the trial court sustained the objection, finding the question improperly "[got] into a custody opinion which [Great-grandparents] said [they] weren't going to do."  **Id.**

specifically stated at the hearing that Mr. Johnson would not be giving an opinion on custody; and (3) Mr. Johnson did not provide any type of custody evaluation. Pa.R.A.P. 1925(a) Op. at 2-3 (unpaginated). On appeal, Great-grandparents now assert Mr. Johnson should have been permitted to give testimony that "would have help shed light on several of the custody factors." Great-grandparents' Brief at 28. Even if the issue were not waived, we would agree with the trial court that no relief is due.

### IX. Conclusion

For the foregoing reasons, we conclude no relief is due on Great-grandparents' claims. We thus affirm the order granting Mother's petition for modification of custody, granting Mother primary physical custody, Great-grandparents partial physical custody, and the parties shared legal custody.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/11/2022